# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| **SKYNET INNOVATIONS LLC**, 8044 Montgomery Rd., Suite 510 A Cincinnati, Ohio 45236 | : : : : |
| Plaintiff, | : Civil Action No. _____ : |
| v. | : : |
| **RAYMOND WALRIVEN,** 1125 Watkins Hill Road New Richmond, Ohio 45157 | : Judge _____ : : |
| and | : **VERIFIED COMPLAINT FOR** : **INJUNCTIVE RELIEF AND DAMAGES** : |
| **FULL SKY TECHNOLOGIES, LLC,** 1095 Nimitzview Drive, #301 Cincinnati, Ohio 45230 | : : **JURY DEMAND ENDORSED HEREON** : |
| Defendants. | : : |

Plaintiff Skynet Innovations LLC ("Plaintiff" or "Skynet") for their Verified Complaint against Defendants Full Sky Technologies, LLC ("Full Sky") and Ray Walriven ("Walriven") (collectively, "Defendants") sates as follows:

## NATURE OF ACTION

1. This is an action for breach of contract, tortious interference with contract, and violations of the Defend Trade Secrets Act and the Ohio Uniform Trade Secrets Act. The action arises from Defendants' improper and unlawful conduct in utilizing Plaintiff's confidential information and trade secrets to solicit and induce Plaintiff's employees to leave employment with Plaintiff. These actions are in breach of contractual restrictive covenants between Defendant Walriven and Plaintiff and violate state and federal law.

## PARTIES

2. Plaintiff Skynet Innovations LLC ("Skynet") is a limited liability company registered to do business in the State of Ohio, with operations located in Hamilton County, Ohio.

3. Defendant Raymond Walriven ("Walriven") is an individual who, upon information and belief, resides in Clermont County, Ohio.

4. Defendant Full Sky Technologies, LLC ("Full Sky") is a limited liability company registered to do business in the State of Ohio, with operations located in Hamilton County, Ohio.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction pursuant to 18 U.S.C. §1836 (Defend Trade Secrets Act of 2016) and 28 U.S.C. §1367 (supplemental jurisdiction over pendant state law claims).

6. Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because of substantial portion of the events giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

**A.  Skynet's Business Involves Confidential and Proprietary Information**

7. Skynet was founded in 2008 and is a pioneering force in the information technology ("IT") services market focusing on delivering comprehensive managed IT support and innovative solutions.

8. In order to achieve its superior position in the IT services market, Skynet developed, acquired, and maintained in secrecy valuable proprietary and confidential processes, techniques, and systems ("Proprietary Information").

9. Skynet has invested significant time and funds to develop and maintain its Proprietary Information and has implemented processes to ensure that this information can only be accessed by authorized persons.

    **B.    Walriven's Employment with Skynet**

10. Walriven began his employment with Skynet on April 2, 2018, and at the time he resigned from Skynet in March 2025 served as Skynet's Director of Client Services, a position that reported directly to Skynet's Chief Executive Officer ("CEO").

11. Skynet's Director of Client Services plays a critical role in leading and overseeing Skynet's client success team, driving customer satisfaction, and ensuring the long-term success and retention of Skynet's clients.

12. During Walriven's employment with Skynet, he oversaw Skynet's procurement process, working closely with vendors and internal stakeholders to source and negotiate contracts for hardware, software, and other technology solutions.

13. During Walriven's employment with Skynet, he led the team responsible for application services, including software implementation, configuration, customization, and ongoing support.

14. As Director of Client Services, Walriven had nine (9) direct reports. Accordingly, Walriven had access to Proprietary Information regarding these direct reports, including compensation information, internal metrics on work performance, and other similar information.

15. Throughout his employment, Walriven had extensive access to Skynet's strategies, structure, programs, and other Proprietary Information.

    **C.    Walriven's Non-Solicitation and Non-Disclosure Agreement**

16. Due to his access to Skynet's customer relationships and critical business information, Walriven and Skynet entered into a "Non-Solicitation and Non-Disclosure Agreement" (hereinafter the "Agreement") with Skynet in April 2024 upon a change in Skynet's ownership.

17. Walriven executed the Agreement on April 22, 2024. A copy of Walriven's executed Agreement is attached to this Complaint as Exhibit A.

18. Walriven's Agreement contains several restrictions on Walriven's use and disclosure of Skynet's "Confidential Information," and defines Confidential Information as follows:

> [A]ll confidential, non-public and proprietary information of the Company and its affiliates disclosed to, obtained by or conceived or learned of by Employee as a result of, through or during Employee's engagement by the Company and that relates to the business of the Company, or the commercial activities of the Company or its customers, prospective customers and suppliers, including, but not limited to, the Company's financial statements and financial information; methods of operation, processes designs, and training; name, address, phone number, and contact persons relating to customers, and customer lists; pricing policies and price lists; supplier lists; marketing information including promotional and instructional materials, and selling information, know-how, trade secrets, technical information, and specifications concerning the Company's technology and processes; and information concerning the Company's partners, suppliers, customers and/or business contacts, which information is not generally known in the relevant trade or industry.

19. Walriven's Agreement contained the following agreed-upon restrictions regarding the use and disclosure of Skynet's Confidential Information:

> [Walriven] shall (i) maintain the confidentiality of all Confidential information, (ii) not, directly or indirectly, disclose, disseminate, or divulge any Confidential Information to any third parties or any person or entity not authorized to receive Confidential Information by the written consent of the Company and (iii) not use any Confidential Information except in connection with [his] employment with the company.

(Exhibit A, Section 2)

4

20. Walriven further agreed that in any proceeding to enforce the Agreement's prohibition on the improper use of confidential information, "temporary and permanent injunctive relief, without posting any bond whatsoever, may be granted." (Exhibit A, Section 2).

21. The Agreement also contained a non-solicitation provision wherein Walriven agreed not to solicit Skynet's clients:

> [F]or a period of one (1) year from the Effective Separation Date, [Walriven] shall not directly or indirectly, individually or in concert with any other person or entity or through a corporation, partnership or other entity, deal with, correspond with, provide services or goods to, accept business from, or otherwise work with any Customer, Client, or Prospective Client of the Company.

(Exhibit A, Section 3.1)

22. The Agreement also contained a non-solicitation provision wherein Walriven agreed not to solicit Skynet's employees for one year after leaving employment with Skynet:

> During [Walriven's] employment with the Company and for a period of one (1) year from the Effective Separation Date,[Walriven] shall not, directly or indirectly, solicit, induce, or attempt to solicit or induce any current employee of the Company (or any employee of the Company whose employment with the Company ended within six (6) months of Employee's separation of employment with the Company) either to leave employment with the Company or to obtain employment or become a contractor with any other person or entity.

(Exhibit A, Section 3.2)

23. When he executed the Agreement, Walriven agreed that "his fulfillment of the obligations contained in this Agreement are necessary to protect [Skynet]'s value, goodwill, Confidential Information, and customer and/or client relationships." (*Id.*, Section 3.3).

**D.  Walriven is Tasked to Manage Skynet's Relationship with Defendant Full Sky, Then Leaves Skynet to Work for Full Sky**

24. Part of Skynet's business model includes serving as an independent contractor for other IT services firms.

25. From August 9, 2021 to April 9, 2025, Skynet served as an independent contractor for Full Sky, providing services to specific Full Sky clients by agreement.

26. Despite their limited contractual relationship, Skynet and Full Sky are direct competitors—Full Sky offers many of the same services as Skynet and requires personnel with similar expertise as Skynet, and accordingly, the companies compete for clients and employees.

27. Skynet and Full Sky decided to terminate their contractual relationship in early 2025.

28. From January 7, 2025 to April 9, 2025, Skynet was tasked with transitioning Full Sky's clients back to Full Sky as part of the process of ending the companies' contractual relationship. Skynet assigned Walriven to manage the transition process on Skynet's end.

29. Shortly after the transition process was complete, Walriven provided notice of his intent to resign employment with Skynet.

30. Initially, Walriven was not transparent with Skynet regarding his next employer; instead, Walriven told Skynet he would be leaving the IT services industry entirely and working for his family's plumbing business as an Account Manager. Walriven's representations to Skynet were patently false.

31. In fact, Walriven had already accepted an offer to become an employee and part owner of Full Sky.

32. On March 5, 2025, as part of the offboarding process, Walriven received a written offboarding notice that included a reminder of his post-employment restrictive covenants contained in the Agreement. That written offboarding notice is attached to this Complaint as Exhibit B.

33. Walriven's employment with Skynet ended on March 7, 2025.

34. After leaving Skynet, Walriven became an employee, Managing Partner, and part owner of Full Sky. Skynet only became aware of Walriven's new employment arrangement on or around April 27, 2025 when a member of its executive team ran into Walriven at a trade show in Las Vegas. At this time, Walriven was again reminded of the post-employment restrictive covenants contained in Exhibit A.

    E.    **Walriven Solicits Skynet Employees for Full Sky's Benefit Utilizing Skynet's Confidential Information**

35. Shortly after joining Full Sky, upon information and belief, Walriven took several actions to recruit Skynet's employees to leave Skynet and join Full Sky in direct violation of his Agreement.

36. On May 15, 2025, a Skynet employee named Bryan Linde ("Linde"), who had previously been Walriven's direct report while Walriven worked for Skynet, resigned his employment.

37. Linde informed a coworker at Skynet that he was leaving to take a position with Full Sky.

38. Upon information and belief, Walriven was directly or indirectly involved in recruiting Linde to leave Skynet to work for Full Sky.

39. Skynet is aware that Walriven has also reached out directly to at least two other employees of Skynet, upon information and belief, in an attempt to recruit those employee, two more of Walriven's former direct reports, to leave Skynet and work for Full Sky.

40. Full Sky is fully aware of Walriven's post-employment restrictive covenants under Walriven's Agreement.

41. Despite being aware of Walriven's restrictive covenants, upon information and belief, Full Sky has facilitated and encouraged the efforts of Walriven (who is himself an owner of Full Sky) to recruit Skynet's employees.

42. Any efforts by Walriven to recruit Skynet's employees in violation of his Agreement necessarily require Walriven to misappropriate Confidential Information obtained during the course of his employment with Skynet on behalf of Full Sky, which is itself a violation of Walriven's Agreement with Skynet.

43. Based upon Walrivin's continued and intentional violations of his Agreement, it is inevitable that Walrivin, unless restrained, will continue to violate the Agreement by utilizing Skynet's confidential and proprietary information to solicit Skynet's employees to leave Skynet and work for Full Sky.

## COUNT I—BREACH OF CONTRACT
### (Against Walriven)

44. Skynet incorporates by reference Paragraphs 1-43 as if fully restated herein.

45. The Agreement with Skynet that Walriven signed with Skynet on April 22, 2024, constitutes a legally enforceable contract.

46. Pursuant to his Agreement with Skynet, Walrivin is prohibited from directly or indirectly soliciting, inducing, or attempting to solicit or induce any current employee of Skynet or any employee whose employment with Skynet ended within six (6) months.

47. Pursuant to his Agreement with Skynet, Walrivin is prohibited from utilizing or disclosing any confidential information obtained during the course of his employment with Skynet.

48. The terms and conditions of Walriven's Agreement with Skynet are reasonable and enforceable.

49. After leaving employment with Skynet and becoming an employee and part owner of Full Sky, a direct competitor of Skynet, upon information and belief, Walrivin has directly solicited multiple Skynet employees and induced them to leave Skynet and work for Full Sky, succeeding in at least one instance.

50. Walrivin's solicitation of Skynet employees to leave employment with Skynet and work for Full Sky is a breach of his Agreement.

51. Upon information and belief, Walriven has utilized Skynet's Confidential Information in his efforts to solicit Skynet employees.

52. The misappropriation of Skynet's Confidential Information is in and of itself a breach of Walriven's Agreement.

53. By soliciting Skynet's employees and misappropriating Skynet's Confidential Information in direct violation of his Agreement, Walrivin has caused Skynet to suffer irreparable harm and significant financial damages.

54. Upon information and belief, if not enjoined from doing so, Walriven will continue to solicit Skynet's employees and clients and misappropriate Skynet's Confidential Information in violation of his Agreement.

55. Skynet's remedy at law is therefore inadequate.

56. To prevent Skynet from suffering further irreparable harm, Skynet requests an Order from the Court restraining and enjoining Walrivin from violating the terms of his Agreement, as well as an award providing injunctive relief, compensatory damages, punitive and/or exemplary damages, costs, attorney's fees, and such other relief as the Court deems appropriate.

**COUNT II— TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against Full Sky)**

57. Skynet incorporates by reference Paragraphs 1-56 as if fully restated herein.

58. At all times relevant to this action, Full Sky was fully aware that Walriven had an Agreement that imposed reasonable restrictions on his solicitation of Skynet employees, as well as restrictions on the unauthorized dissemination or use of Skynet's Confidential Information.

59. Despite this knowledge, upon information and belief, Full Sky has knowingly facilitated Walriven's breach of his Agreement and tortiously interfered with Skynet's rights under that Agreement by using Walriven as an agent to solicit Skynet's employees and clients and by soliciting, receiving, and using confidential information belonging to Skynet.

60. Without Full Sky's interference, Walriven would not have breached his Agreement with Skynet.

61. Full Sky's tortious interference with Skynet's contractual rights was done deliberately and with malicious intent to injure Skynet.

62. As a result of Full Sky's conduct, Skynet has suffered damages and has been and will continue to be irreparably harmed.

63. Skynet's remedy at law therefore is inadequate.

64. Skynet is accordingly entitled to injunctive relief, compensatory damages, punitive and/or exemplary damages, costs, attorney's fees, and such other relief as the Court deems appropriate.

**COUNT III— MISAPPROPRIATION OF TRADE SECRETS—VIOLATION OF OHIO UNIFORM TRADE SECRETS ACT**
**(Against All Defendants)**

65. Skynet incorporates by reference Paragraphs 1-64, as if fully restated herein.

66. Skynet confidential and propriety information, as described above, constitute "trade secrets" under Ohio's Uniform Trade Secrets Act, R.C. § 1333.61 *et seq.*

67. Such confidential and proprietary information is economically viable to Skynet and is not readily ascertainable by those who may improperly obtain the economic benefit from its use.

68. Skynet took precautions to maintain the secrecy of such trade secrets.

69. By acquiring, disclosing, and/or using Skynet confidential and proprietary information to poach Skynet employees and compete with Skynet, Defendants have misappropriated Skynet trade secrets.

70. Defendants have willfully and maliciously misappropriated Skynet trade secrets and have utilized those trade secrets with the specific intent to contact, solicit, divert, or damage Skynet business or goodwill.

71. As a result of Defendants' conduct, Skynet has been and will continue to be irreparably harmed.

72. Skynet has no adequate remedy at law.

73. Skynet is accordingly entitled to injunctive relief, compensatory damages, punitive and/or exemplary damages, costs, attorney's fees, and such other relief as the Court deems appropriate.

### COUNT IV— MISAPPROPRIATION OF TRADE SECRETS—VIOLATION OF DEFEND TRADE SECRETS ACT
### (Against All Defendants)

74. Skynet incorporates by reference Paragraphs 1-73, as if fully restated herein.

75. Skynet confidential and propriety information, as described above, constitute "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

76. Such confidential and proprietary information is economically viable to Skynet and is not readily ascertainable by those who may improperly obtain the economic benefit from its use.

77. Skynet took precautions to maintain the secrecy of such trade secrets.

78. By acquiring, disclosing, and/or using Skynet confidential and proprietary information to poach Skynet employees and compete with Skynet, Defendants have misappropriated Skynet trade secrets.

79. Defendants have willfully and maliciously misappropriated Skynet trade secrets and have utilized those trade secrets with the specific intent to contact, solicit, divert, or damage Skynet business or goodwill.

80. As a result of Defendants' conduct, Skynet has been and will continue to be irreparably harmed.

81. Skynet has no adequate remedy at law.

82. Skynet is accordingly entitled to injunctive relief, compensatory damages, punitive and/or exemplary damages, costs, attorney's fees, and such other relief as the Court deems appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Skynet Innovations LLC prays for the following relief:

83. An Order of injunctive relief prohibiting Defendants from violating Walriven's Agreement with Skynet; and

84. Judgment against Defendants for specific performance, compensatory damages, punitive damages, exemplary damages, costs, attorney's fees, and such other relief as the Court deems appropriate.

Respectfully submitted,

*/s/S. Joseph Stephens, III*
S. Joseph Stephens III (OH 0093887)
Dinsmore & Shohl LLP
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.977.8613

Facsimile: 513.977.8141
E-mail: joseph.stephens@dinsmore.com
*Counsel for Plaintiff,*
*Skynet Innovations LLC*